# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| (1) ACADIANA PLAZA, A PARTNERSHIP IN COMMENDAM<br>4975 ABELIA CT.<br>BATON ROUGE, LA 70808, | **COMPLAINT FOR BREACH OF CONTRACT AND JUST COMPENSATION** |
| (2) BAYOU TRACE, A PARTNERSHIP IN COMMENDAM<br>4975 ABELIA CT.<br>BATON ROUGE, LA 70808, | **File No.:** 18-1990 C |
| (3) BAYSIDE VILLAGE, A PARTNERSHIP IN COMMENDAM<br>4975 ABELIA CT.<br>BATON ROUGE, LA 70808, | |
| (4) IMA LIMITED PARTNERSHIP, A LIMITED PARTNERSHIP IN COMMENDAM<br>P.O. Box 45630<br>Baton Rouge, LA 70895, | |
| (5) RIVERSIDE VILLAGE, A PARTNERSHIP IN COMMENDAM<br>4975 Abelia Court<br>Baton Rouge, LA 70808, | |
| (6) TRIPLE R CORPORATION – DENHAM SPRINGS, A PARTNERSHIP IN COMMENDAM<br>P.O. Box 2767<br>Opelika, AL 36803, | |

(7) TRIPLE R CORPORATION – ST.
FRANCISVILLE, A PARTNERSHIP
IN COMMENDAM
P.O. Drawer 2767
Opelika, AL 36803,

(8) WESTLAKE – TRIPLE R LIMITED
PARTNERSHIP, A PARTNERSHIP
IN COMMENDAM
P.O. Drawer 2767
Opelika, AL 36803,

       Plaintiffs,

v.

UNITED STATES OF AMERICA,

       Defendant.

---

For their Complaint against the defendant United States of America, plaintiffs state and allege as follows:

## PRELIMINARY ALLEGATIONS

1.    Each plaintiff contracted with the United States of America ("the Government") for a loan to provide rental housing for low- and moderate-income persons for so long as the loan obligations remained unsatisfied ("the housing program"). The Government entered into these contracts ("the contracts") with each plaintiff by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA").

2.    The terms of these contracts permit each plaintiff to terminate its participation in the Government's housing programs "at the option" of each plaintiff upon prepayment of its federally made or insured mortgage. Pursuant to these contracts, said optional termination

right could be exercised by plaintiffs "at any time" prior to the termination of the fifty (50)-year term of each contract.

3. Congress in 1988 and 1992 enacted legislation that repudiated the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiffs contend in this action that the enactment of this legislation anticipatorily repudiates the contracts between defendant and plaintiffs. As is its right, each plaintiff has elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by the contracts, i.e., the date that each plaintiff would achieve its option of terminating its contract but for the Government's repudiation. Each plaintiff also alleges that said legislation results in a taking of each plaintiff's property without just compensation.

4. Plaintiffs seek to recover in this action the damages they have suffered and continue to suffer as a result of the breach by the Government of each plaintiff's contract and for just compensation for the taking of their properties.

**(Post-1979 FmHA Contracts)**

5. Each plaintiff entered into its FmHA contract on or after December 21, 1979 and before December 15, 1989 ("the post-1979 FmHA contracts"), and thereby is contractually entitled to exercise its option to prepay at any time. However, by their terms all post-1979 FmHA contracts are subject to a fifteen (15)- or twenty (20)-year restrictive-use provision. This provision is binding upon the owners and their successors in interest and requires that the property be operated as low-rent housing for a period of fifteen (15)- or twenty (20)-years from the date of loan origination.

6. The 1992 Legislation described below extended to post-1979 FmHA contract holders the provisions of the 1988 Legislation, also described below, that had repudiated the contractual termination right of pre-1979 FmHA contract holders.

## THE PARTIES

### (Party Plaintiffs)

7. The plaintiffs are related partnerships, corporations, or other legal entities that share common ownership. Each plaintiff listed herein also entered into a contract with FmHA for a loan to provide rental housing for low- and moderate-income residents meeting Government eligibility standards.

### List of Plaintiffs

8. Plaintiff, Acadiana Plaza, a Partnership in Commendam, with an address of 4975 Abelia Ct., Baton Rouge, LA 70808, is a partnership that entered into a contract for rental housing at the following project known as:

(i) Acadiana Plaza Apartments, case and project number 22 039 823765805 01 7, located at 1042 Hospital Rd., New Roads, LA 70760, consisting of thirty-two (32) units, which closed on September 10, 1982.

9. Plaintiff, Bayou Trace, a Partnership in Commendam, with an address of 4975 Abelia Ct., Baton Rouge, LA 70808, is a partnership that entered into a contract for rental housing at the following project known as:

(i) Bayou Trace Apartments, case and project number 22 028 762455630 02 2, located at 333 Teljean Rd, Lafayette, LA 70503, consisting of forty-four (44) units, which closed on August 20, 1984.

10. Plaintiff, Bayside Village, a Partnership in Commendam, with an address of 4975 Abelia Court, Baton Rouge, LA 70808, is a partnership that entered into a contract for rental housing at the following project known as:

    (i) Bayside Village Apartments, case and project number 22 051 837299043 01 4, located at 3522 Highway 182, Berwick, LA 70342, consisting of forty-four (44) units, which closed on December 17, 1984.

11. Plaintiff, IMA Limited Partnership, a Limited Partnership in Commendam, with an address of P.O. Box 45630, Baton Rouge, LA 70895, is a partnership that entered into a contract for rental housing at the following project known as:

    (i) Iberville Manor Apartments, case and project number 22 024 777649353 01 4, located at 25925 Tenant Road, Plaquemine, LA 70764, consisting of thirty-two (32) units, which closed on June 8, 1989.

12. Plaintiff, Riverside Village, A Partnership in Commendam, with an address of 4975 Abelia Court, Baton Rouge, LA 70808, is a partnership that entered into a contract for rental housing at the following project known as:

    (i) Riverside Village Apartments, case and project number 22 061 933967250 01 5, located at 789 S Vaughn, Brusly, LA 70719, consisting of forty-four (44) units, which closed on April 10, 1985.

13. Plaintiff, Triple R Corporation - Denham Springs, A Partnership in Commendam, with an address of P.O. Box 2767, Opelika, AL 36803, is a partnership that entered into a contract for rental housing at the following project known as:

    (i) Plantation South Apartments, case and project number 22 032 789595564 01 0, located at 8051 Vincent Rd, Denham Springs, LA 70726, consisting of fifty (50) units, which closed on August 16, 1982.

  14. Plaintiff, Triple R Corporation – St. Francisville, A Partnership in Commendam, with an address of P.O. Drawer 2767, Opelika, AL 36803, is a partnership that entered into a contract for rental housing at the following project known as:

    (i) Audubon Apartments, case and project number 22 063 660848043 01 0, located at 5180 Burnett Road, St. Francisville, LA 70775, consisting of thirty-two (32) units, which closed on March 29, 1983.

  15. Plaintiff, Westlake – Triple R Limited Partnership, A Partnership in Commendam, with an address of P.O. Drawer 2767, Opelika, AL 36803, is a partnership that entered into a contract for rental housing at the following project known as:

    (i) Westlake Plaza Apartments, case and project number 22 010 682199966 01 0, located at 1411 Clarence St, Westlake, LA 70669, consisting of forty-two (42) units, which closed on March 28, 1985.

**(Party Defendant)**

  16. The FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service

("RHS").  (Agency Name Change, 61 Fed. Reg. 2899 (1996).)  RHS is itself part of the area within the Department of Agriculture known as "Rural Development."  As used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

17.  An actual controversy exists between each plaintiff and the Government.

## JURISDICTION

18.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491.

## BACKGROUND

19.  Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities.  During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

20.  In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States.  Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968)) (now codified at 42 U.S.C. §§ 1485 and 1490a, respectively).  Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

21.  Each plaintiff agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve a

housing property and to enter into a Loan Agreement with the FmHA. Each Loan Agreement, *inter alia*, imposed significant obligations on each plaintiff regarding the tenants to whom each plaintiff could rent, the rents it could charge, the profits it could receive, and the maintenance and financial operation of each property ("the low income affordability restrictions").

22. Contemporaneous with the execution of the Loan Agreement, and as referenced therein, each plaintiff executed, *inter alia*, a Promissory Note and Real Estate Mortgage for each property. In executing each Promissory Note, each plaintiff promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreement, together with interest at a specified rate. Each Promissory Note provided, *inter alia*, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

23. By signing its respective Loan Agreement and Promissory Note referenced therein, each plaintiff promised, *inter alia*, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use its FmHA project for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on its mortgage; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiffs to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of each of their Promissory Notes.

24. The Loan Agreements obligate plaintiffs to operate their housing projects in accordance with FmHA regulatory strictures only so long as each plaintiff's indebtedness and other obligations under each Promissory Note, Real Estate Mortgage, and any related agreement remain unsatisfied. Thus, each plaintiff's obligation under its respective Loan

Agreement to operate its housing properties in accordance with FmHA regulations expires upon its prepayment in full of its indebtedness and satisfaction of any related obligations.

25. Consistent with the language of each Promissory Note, FmHA regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permit each plaintiff to prepay its mortgage loan at any time at its option, so long as it and its successors in interest continued to comply with the restrictive-use clause contained in each Real Estate Mortgage.

26. Accordingly, each plaintiff is entitled under its Loan Agreement with FmHA, FmHA's regulations, and its Promissory Note, to terminate its respective contract by prepaying the mortgage loan at any time at its option to enable it to go to market and maximize its return on investment.

27. Notwithstanding each plaintiff's contractual right to terminate its participation in the Government's housing programs, the Government repudiated its obligation to recognize plaintiffs' rights by enacting the legislation described below.

## CONGRESSIONAL ACTION

### The 1988 Legislation

28. On February 5, 1988, Congress imposed restrictions on prepayment, thereby repudiating the right of pre-1979 FmHA contract holders to exercise their contractual termination right at any time at their option, by enacting Title II of the Housing and Community Development Act of 1987.  (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note) ("the 1988 Legislation" or "ELIHPA").)  Congress made certain findings in the 1988 Legislation, including but not limited to the following:

9

      (i)      some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e., FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;

      (ii)      the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;

      (iii)      a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;

      (iv)      until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

(The 1988 Legislation, Section 202(a).)

**(The 1988 Legislation's Prepayment Restrictions For Pre-1979 FmHA Contracts)**

      29.      Congress estimated that a large portion of the 367,000 units owned by both pre-1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable to being prepaid during the few years following 1988. Post-1979 FmHA loan holders, however, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for fifteen (15) or twenty (20) years. Thus, until such time as Congress could act on recommendations resulting from the continuing reviews of alternative responses to the perceived imminent loss of affordable housing and devise a permanent solution for all FmHA loans, the 1988 Legislation confined itself to dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

30. The 1988 Legislation contained measures designed to place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. (The 1988 Legislation, Section 241.)

31. Although denominated as an "interim measure," the 1988 Legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not expire automatically. Instead of repealing the "interim measures" directed at pre-1979 FmHA contract holders, Congress devised, in 1992, a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights.

32. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the 1988 Legislation recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the projects were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

33. Contrary to the provisions of pre-1979 FmHA contracts, the 1988 Legislation repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option. (The 1988 Legislation, Section 241.)

### The 1992 Legislation

34. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)) ("the 1992 Legislation or Title VII").) This amendment eliminated the interim

measure status of the 1988 Legislation's provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

35. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 Legislation made permanent for <u>all</u> contracts formed before 1989 the restrictions that ELIHPA had imposed on pre-1979 FmHA contracts.  (42 U.S.C. § 1472(c)(4)(A), as amended.)

36. For the first time, the 1992 Legislation permanently applied ELIHPA's restrictions to <u>all</u> FmHA contracts entered into before 1989.  The statute made no exception for contracts entered into before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989.  Thus, the 1992 Legislation, signed into law by the President on November 2, 1992, together with implementing regulations, permanently repudiates the contractual termination right of <u>any</u> FmHA loan holder who chooses to terminate its contract.

37. Pursuant to the 1992 Legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed.  (The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).)

38. The 1992 Legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said

contract holders to extend the low-income use of their projects. In general, the incentives allowed owners whose projects satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. (42 U.S.C. § 1472(c)(4)(B).)

39. The appraisal guidelines used by FmHA to determine incentives are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

40. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 Legislation provides for forced sales of said owners' properties to nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. (42 U.S.C. § 1472(c)(5)(A) - (F).)

41. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced; or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. (42 U.S.C. § 1472(c)(5)(G)).

### Material Terms

42. Each plaintiff's contractual right to terminate its contract at any time at its option was a material term of its contract. In the absence of this contractual termination right, plaintiffs would not have entered into their respective contracts with FmHA. But for the legislation repudiating each plaintiff's contractual termination right, each plaintiff would achieve its option of terminating its contract on those dates that would maximize its investment return on its property, or on such other dates as it would deem appropriate given its individual circumstances.

43. Plaintiffs have complied fully and in good faith in all material respects with the terms and conditions of their contracts and have otherwise fully performed their undertakings in connection therewith.

### THE IMPACT OF THE REPUDIATING LEGISLATION UPON PLAINTIFFS

44. The statutory scheme under the 1988 and 1992 Legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their projects; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of each plaintiff's contractual termination right.

45. The legislation complained of herein also results in a taking of each plaintiff's property for public use without just compensation. By requiring plaintiffs to house low-

income tenants and to accept new low-income tenants, the Government has (i) conscripted plaintiffs' properties for public use; (ii) physically invaded or authorized others to physically invade plaintiffs' properties; and (iii) deprived each plaintiff of its distinct investment-backed expectations with regard to its property, all without providing any just compensation.

## DAMAGES

46. Each plaintiff intended, upon entering into its contract with the FmHA, to exercise its prepayment right and terminate its participation in the Section 515 program prior to the expiration of its full mortgage term. Each plaintiff intended to prepay the mortgage on its project within six years prior to the filing of this complaint, and would have done so within said six-year period of time but for the Government's wrongful repudiation.

47. Thus, each plaintiff in this action commenced this civil action within six years after (1) the date that it intended to prepay its mortgage loan and terminate its contract with the FmHA, and (2) the date that it would have prepaid but for the Government's repudiation of its contract right.

48. Each plaintiff was ready, willing, and able to pay off its mortgage loan balance on its respective above-described property at the time that it intended to exercise its right to prepay and leave the Section 515 program.

49. The incentives and other alternatives potentially provided by the 1988 and 1992 Legislation and implementing regulations are wholly inconsistent with the plaintiffs' original contract rights. Among other things, said incentives and alternatives would require plaintiffs to negotiate substitute alternative transactions with the party that repudiated their contracts, thereby exposing them to unreasonable financial risks. Moreover, said incentives and alternatives fall far short of compensating plaintiffs for the damages they have suffered and

will continue to suffer as a result of the Government's repudiation of its contracts with plaintiffs, and would not provide just compensation to plaintiffs for the taking of their properties for public use.

50. As a result of the Government's repudiation of plaintiffs' contractual termination rights, each plaintiff has been (i) deprived of its right to use or dispose of its respective property as it sees fit; (ii) compelled to allow the Government to use or authorize others to purchase and use its respective property to fulfill the Government's undertaking to provide low cost rental housing to a segment of the public meeting Government eligibility standards; and (iii) required to continue to comply with the costly restrictions and obligations imposed upon it by its respective Loan Agreement.

51. But for the Government's conduct, each plaintiff would have terminated its contract by prepaying its mortgage loan and/or selling its property to a third party. The Government has deprived and will deprive each plaintiff of the earnings on the sale of its property because the Government's repudiation of each plaintiff's contractual termination right has prevented any prepayment, and consequently any sale, from taking place.

52. But for the Government's conduct, each plaintiff would have terminated its contract by prepaying its mortgage loan and converting its property into commercial housing for which it could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's program. The Government has deprived and will deprive each plaintiff of the value of the increased rents it would receive because the Government's repudiation of each plaintiff's contractual termination right has prevented any prepayment, and consequently any increase in rents, from taking place.

53. Each plaintiff has suffered other, additional damages including without limitation the lost opportunity costs associated with investment and business opportunities each plaintiff has been foreclosed from pursuing by virtue of its inability to exercise its contractual right to terminate its contract at any time at its option.

## COUNT ONE

(Breach of Contract)

54. Plaintiffs incorporate paragraphs 1 through 53 by reference as if fully set forth herein.

55. Defendant's legislation anticipatorily repudiated each contract entered into between the defendant and plaintiffs. The Government's anticipatory repudiation has deprived and will deprive each plaintiff of its contractual right to terminate its contract at any time at its option before the expiration date of its fifty (50)-year contract term. The Government's anticipatory repudiation constitutes a breach of each plaintiff's contract as of the date of Government performance required by each contract, i.e., the date that each plaintiff would terminate its contract but for the Government's repudiation.

56. As a direct and proximate result of defendant's conduct, plaintiffs have been damaged in an amount which will be proven at trial. Each plaintiff continues to suffer injury and resulting damages each day that it is denied the ability to exercise its contractual termination right and go to market with its respective property at any time at its option.

## COUNT TWO

(Just Compensation)

57. Plaintiffs incorporate paragraphs 1 through 56 by reference as if fully set forth herein.

58. As of the date of Government performance required by each contract entered into between the defendant and each plaintiff, defendant's conduct constitutes a taking of each plaintiff's real and intangible property interests for public use and requires payment to each plaintiff of just compensation under the Fifth Amendment to the U.S. Constitution.

59. Each plaintiff is entitled to just compensation for the taking of its property in an amount which will be proven at trial. Each plaintiff continues to suffer injury and resulting damages each day that it is denied the ability to convert its respective property to a market rate or conventional property.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for judgment as follows:

## AS TO COUNT ONE

1. That the Court award each plaintiff monetary relief for the damages suffered to date and for the damages each plaintiff continues to suffer as a result of defendant's breach of each plaintiff's contract, in an amount to be determined at trial.

## AS TO COUNT TWO

2. That the Court award each plaintiff just compensation during the period during which each plaintiff's respective property has been taken for public use by defendant, in an amount to be determined at trial.

## AS TO ALL COUNTS

3. That the Court award each plaintiff its attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

4. That the Court award each plaintiff its costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem just and proper.

Dated: December 27, 2018

Respectfully submitted,

By:

s/Jeff H. Eckland

Jeff H. Eckland

Attorney for Plaintiffs

ECKLAND & BLANDO P.A.
JEFF H. ECKLAND
Mark J. Blando, Of Counsel
800 Lumber Exchange Building
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: 612-236-0160
Facsimile: 612-236-0179
jeckland@ecklandblando.com